UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at KNOXVILLE


GROVER DARNELL COWART    )
               )
  *Petitioner*,        )
               )
v.             )   No. 3:03-cv-518
               )   *Jordan*
               )
JAMES BOWLEN, Warden    )
               )
  *Respondent*.       )


### MEMORANDUM


This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by

petitioner Grover Darnell Cowart ("Cowart"). The matter is before the court on the motion

for summary judgment filed by the Attorney General for the State of Tennessee on behalf of

the respondent, and Cowart's response thereto. For the following reasons, the motion for

summary judgment [Court File No. 18] will be **GRANTED**. This action will be

**DISMISSED WITH PREJUDICE**.

I.      Standard of Review

Under Rule 8 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required.  If no hearing is required, the district judge is to dispose of the case as justice dictates.  If the record shows conclusively that Cowart is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied.  *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

The Attorney General has provided the court with copies of the relevant documents pertaining to petitioner's direct appeal and post-conviction proceedings.  [Court File No. 14, Notice of Filing of Documents, Addenda 1-17].   Cowart was convicted by a jury of especially aggravated robbery and attempted first degree murder, and sentenced to consecutive sentences of 25 years and 20 years, respectively; Cowart was acquitted of aggravated rape.  On direct appeal, the Tennessee Court of Criminal Appeals affirmed the especially aggravated robbery conviction.  The appellate court, however, reversed the attempted first degree murder conviction and remanded for a new trial on that charge.  The court also remanded because the trial court failed to make adequate findings to support consecutive sentencing.   *State v. Cowart*, No. 03C01-9512-CR-00402, 1999 WL 5174

(Tenn. Crim. App. January 8, 1999) [Addendum 5], *perm. app. denied, id.* (Tenn. June 28, 1999) [Addendum 9].

Cowart next filed a petition for post-conviction relief as to the especially aggravated robbery conviction, which was denied on the merits. *State v. Cowart*, No. E2002-02232-CCA-R3-PC, 2003 WL 21487193 (Tenn. Crim. App. June 27, 2003) [Addendum 15], *perm. app. denied, id.* (Tenn. October 6, 2003) [Addendum 17]. According to the Court of Criminal Appeals, the State had nolled the attempted first degree murder charge. *Id.*, slip op. at 6 n.2, 2003 WL 21487193 *5.

In post-conviction proceedings, the Tennessee Court of Criminal Appeals summarized the evidence against Cowart as follows:

> On direct examination, the victim, a young woman, testified that, on the night of September 24, 1992, the Defendant, her boyfriend, came over to her apartment at about 11:15 p.m. They talked for a few minutes, and then he stated that he was going to leave. He went to her front door and unlocked the several locks. He then began kissing the victim, and they ended up in her bedroom. The Defendant removed the victim's panties, and they were sitting on the bed together when the victim saw the Defendant's friend and roommate, Milton Tucker, behind the Defendant. Tucker was pointing a gun towards the victim. She testified:
>
> > And he pushes [the Defendant] out of the way, and [the Defendant] says, "Man, we don't have any money." So he pushes me back, and he ties my hands and my feet, and I seen [the Defendant] laying on the side of the bed, and he was saying some kind of prayer. And then I was rolled over onto my stomach, and Tucker tried to put some tape around my eyes and my lips, but it wouldn't stick. And, ah, the next thing I heard was somebody messing with a belt buckle. And someone tried to insert themselves from that position, but they couldn't because my legs were so tight together, and then I was rolled over onto my back again, and a pillow was put over my head,

and my legs were United a little bit, and that's when I was raped. And then someone retaped them again. Then I heard a noise a little ways from the bedroom, and I heard [the Defendant] say again, "Man, I told you we don't have any money." And then I heard, in the kitchen, my refrigerator door open, and Tucker said, "Do you have anything to drink, bitch?" And I said, "No," and then I heard someone going through my silverware, and then, then Tucker's voice was in the bedroom, and he said, "Where is your purse?" And I said, "It's on my dresser." So, I heard him going through my purse and my keys, and Tucker said, "Did you like it?" And I said, "Yes," because I was afraid if I said no it would happen again. And then he said, "Well, why did you cry?" And I never did answer him. So, I was rolled back over onto my stomach again, and I asked, I asked, I said, "Would you please untie my hands a little bit." I said, "They are numb, I can't feel them anymore." And he said, Tucker said, "Well, I'll see what I can do about that ." And I laid there for, I don't know how long. The next thing I know my head was lifted and I seen a white towel go around my neck, and I was cut, and then I was stabbed on my left side and my right side. And then I heard Tucker say something about my phone, and then he cut my cord. And then I didn't hear anything after that for a few more minutes, I just laid there, I didn't move, and then I felt someone poke at my feet with a very sharp object. And I still didn't move, and Tucker's voice said, "Remember, Kim, I see you every day, I know everything you do, and everywhere you go, and if you stick your head out this door I'll blow your brains out." And then I laid there a few more minutes, and I heard my car start.

The victim was subsequently able to summon help from her neighbors and was taken to the hospital for treatment. Due to the extent of her injuries, she remained in the hospital for over two weeks.

The victim testified that it was Tucker who initially tied her up. She was then rolled over onto her stomach. At that point in time, she testified, she did not know where the Defendant was, and did not see him during the remainder of the assault. When she was rolled back over to her back prior to being raped, someone placed a pillow over her face; accordingly, she could not see who raped her. She also did not see who cut her because she had been rolled back over onto her stomach by that time.

4

On cross-examination, the victim testified that, while she and the Defendant were hugging and kissing, she did not feel any weapons on him. She reiterated that Tucker had initially tied her up and rolled her onto her stomach but maintained that she did not know who actually raped her. She admitted, however, telling the police on October 15, 1992:

> then I was, like, Oh, my God, you know, and [Tucker] tied my hands up, over my head, and tied my feet together with that tape, put a gun to my head, and he tried to put a pillow over my face, but he had a hard time holding it in one position ... and I could see figures of him through my bed, because I've got mirrors on my headboard ... and ... so he rolled me over ... and I heard him undo his belt ... and he tried to insert himself, but he couldn't because my legs were so tight together, so he rolled me back over on my back, and he undid my legs a little bit so they could spread apart, and that is when he raped me ... and then he tied my feet back together, tighter and he rolled me back over on my stomach ... and ... heard him ... he went into the kitchen, and he was going through some silverware, or something, and I heard him say something to [the Defendant], and [the Defendant] said, "Man, we don't have no money." Then he asked me, he said, "Do you have anything to drink, bitch?"

Mr. James Burns testified that he was the victim's next door neighbor. He assisted her immediately after the assault and testified that she said to him, "I can't believe he did it, I can't believe he did it." When Mr. Burns asked her who "he" was, she said, "Jazz," the Defendant's nickname. Mr. Burns also testified that he knew where the victim had parked her car that night in front of the apartments, and that it was gone at the time he was assisting the victim. Mr. Burns relayed this information to the first police officer on the scene, and also gave a description of the vehicle. When the police officer asked for the license plate number, Mr. Burns obtained that information from the victim.

Officer Russell Michael Saylor was the first officer on the scene. He spoke with Mr. Burns and called dispatch with the information about the victim's missing car. He also called repeatedly for an ambulance and secured the scene.

Officer Kenneth Slagle testified that, on the night in question, he saw the victim's car on the side of the road near the victim's apartment building with its lights out. He viewed the license plate number and thereby verified that it was the car on which dispatch had issued a bulletin. The car left as he

5

was verifying its identity, and he subsequently followed it and pulled it over. At that point, Milton Tucker jumped out of the car and began running toward Officer Slagle. Officer Slagle drew his gun and ordered Tucker to "spread eagle" on the back of the car. Tucker did so and was subsequently taken into custody. After Tucker had been placed in the patrol car, Officer Slagle examined the interior of the car. In the right front seat he saw a semiautomatic gun, car keys, a purse, duct tape, and a red ink pen. Officer Slagle testified that he did not see the Defendant that night.

Detective Michael Kenneth Hyde spoke briefly with the victim while she was in the emergency room "near death." He testified that she told him that she had been raped and robbed and cut by a black man whom she did not know. She identified a second man involved as the Defendant.

After the assault on the victim, the Defendant went to Chicago. There, he was apprehended by Chicago police officers acting on an arrest warrant issued by a court in Knoxville, Tennessee. The warrant stated only that the Defendant was wanted on charges of aggravated rape and aggravated robbery. Officer Xavier Castro assisted in taking the Defendant into custody. Officer Castro testified that he and another officer found the Defendant and his brother in an apartment. When the officers entered the apartment, the Defendant's brother became very upset. In order to calm him down, the Defendant told his brother that the officers were there for him, the Defendant. Officer Castro testified that the Defendant's brother asked him what he had done, and the Defendant responded, "I killed her, I killed her."

Officer Castro further testified that, while he was accompanying the Defendant to the police car, the Defendant asked him, "Is she alive?" Officer Castro knew nothing about the details of the crimes underlying the Knoxville arrest warrant, and responded simply by asking the Defendant to cooperate. Officer Castro sat in the back seat of the car with the Defendant, and they were driven to the police station by Detective Guswiler. During the twenty-minute drive, the Defendant kept asking about the condition of the woman in Knoxville. Officer Castro told the Defendant he did not know what the Defendant was talking about, and the Defendant said, "Well, I know how you knew where I was at." At this point, Officer Castro read the Defendant his rights, and the Defendant then informed Officer Castro that the officers knew where to find him because Milton Tucker had informed on him. The Defendant then recited a narrative about how he and Tucker had committed a robbery in Knoxville. Officer Castro testified that the Defendant explained that he and Tucker were both from Chicago and needed money and a vehicle

6

to return to Chicago from Knoxville. The Defendant thought they could get both from the victim. Officer Castro testified, "They were going to do this by, since she was [the Defendant's] friend, he was going to gain her trust and get into the apartment. Then Mr. Tucker was going to come into the apartment and act as a robber. [The Defendant] was then going to control the girl so that she wouldn't resist the robbery. They were going to take the automobile and any money that she had and return to Chicago." The Defendant told Officer Castro that, after they left the apartment, Tucker insisted on driving the victim's car; the Defendant left in another vehicle. The Defendant subsequently saw Tucker being taken into police custody, and so drove on to Chicago by himself. The Defendant also told Officer Castro during the ride to the station that Tucker had "turned violent" while in the victim's apartment, and that Tucker had raped the victim, cut her throat, bound her, and fled.

At the station, the Defendant indicated that he wanted to make another statement. Officer Castro was accompanied by Detective Guswiler and Officer Clemens while the Defendant made this subsequent statement. Officer Castro testified about this second statement:

> This time he says that he had planned, with Tucker, to enter the victim's apartment, rob her of her car and money. That he was going to act as a victim but allow access to the apartment, and he told us, through an open window, that he would leave something unlocked. And that the original plan was to leave the window unlocked.
> He was in the apartment with the victim, this was [the Defendant], for some time when Mr. Tucker entered. Mr. Tucker then came in acting as a robbery. [The Defendant] was controlling the victim. Mr. Tucker then restrained the victim by tying her up with duct tape. Then he began attacking her. When he attacked her [the Defendant] then said that he got into the violence of the act. At which time he admitted raping her. After he admitt[ed] raping her, ah, he then made the statement, "And I cut her throat."

The Defendant testified on his own behalf. He explained that Tucker had decided he wanted to return to Chicago and asked the Defendant if they could make the trip in the victim's car. The Defendant told Tucker that the victim would not let him borrow the car for the trip. Tucker then suggested that the Defendant visit the victim, unlock the door, put the car keys on a table, and occupy the victim in the bedroom so that Tucker could enter the apartment

7

and take the car keys. The Defendant explained that the original plan was for both of them to return later with the keys and take the victim's car.

The Defendant testified that, when he and the victim were on the victim's bed and she screamed, the Defendant saw a man with the lower half of his face covered with a cloth. The Defendant stated that he did not know who the man was and was scared because the man had a gun. The man bound his arms and legs with tape and then, using a headlock, dragged the Defendant out of the bedroom. The man then raped the victim. After the rape, the man pulled down the cloth covering his face, and the Defendant discovered that it was Tucker. The Defendant argued with Tucker about what he had done and initially refused to leave with Tucker. The Defendant testified that Tucker then aimed the gun at him and cocked it, at which point the Defendant decided to cooperate. The Defendant left with Tucker and eventually saw Tucker being apprehended by the police while Tucker was driving the victim's car. The Defendant then borrowed another car and drove to Chicago.

The Defendant denied raping or cutting the victim. He also stated that he did not know that Tucker had cut the victim's throat until after he was arrested. He testified that Officer Castro asked him if he had raped the victim, to which he replied, "No." Officer Castro then asked if Tucker had raped the victim, to which he replied, "Yes." The Defendant further testified that Officer Castro had asked him if he had cut the victim. The Defendant replied, "No, I don't know anything about that." The officer then asked him if Tucker had cut the victim. The Defendant replied, "I told you, I didn't know anything about it." The Defendant denied having told the Chicago police that he raped, cut, or killed the victim. He claimed that his only participation in the crime was unlocking the victim's door and distracting her so that Tucker could enter the apartment and take the victim's car keys.

*State v. Cowart*, slip op. at 1-6, 2003 WL 21487193 **1-4 (footnote omitted) [Addendum 15].

In support of his habeas corpus petition, Cowart alleges the following:  (1) the State failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963); and (2) the trial court erred in not allowing a juror to testify as to the prejudicial

effect of the State withholding the *Brady* information. The Attorney General moves for summary judgment on the basis of the state court findings.

III.     State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Cowart may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Cowart must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Cowart has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively

unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

IV.     Discussion of Grounds for Relief

*A.   Brady Claim*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the U.S. Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 86. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Cowart presented his *Brady* claim to the state courts in post-conviction proceedings, alleging that the prosecution suppressed "written notes prepared by various persons in

conjunction with the investigation and prosecution of the charges against [Cowart]." *State*

*v. Cowart*, slip op. at 6, 2003 WL 21487193 **5 [Addendum 15].

> The notes which are the subject of this action consist of the following: (1) the prosecuting attorney's handwritten notes taken during an interview with the victim on May 17, 1993; (2) handwritten notes taken by another prosecutor during an interview with the victim on September 24, 1992; (3) a typewritten summary about the assault, undated, prepared by Patty Bordwine; and (4) a handwritten statement prepared on September 24, 1992, by Officer Michael S. Cunningham about what Tucker told him about the assault following Cunningham's arrest of Tucker.

> The Defendant contends that the first of these documents is material in that the prosecuting attorney's notes reflecting the interview with the victim provide, in pertinent part,

>> Tucker then standing in bedroom w/ gun: Cowart started praying. Tucker tied v hands & ankles w duck tape. Put pillow over v's face. Tried to put tape on mouth. Heard Tucker undo pants. V on stomach. Rolled v on back. Put pillow over face w/ gun. Then, after penetration, asked "Do you have anything to drink bitch." ... Tucker cut v neck & stabbed in chest twice. Then, later, poked v in feet several times.

> That is, these notes appear to indicate that, during the interview, the victim identified Tucker as the man who raped and cut her. Similarly, the notes taken by the other prosecutor provide, in pertinent part, as follows:

>> looked up and Tucker had gun.
>> "If you look at me I'll kill you"
>> "Give me your money"
>> rolled V on stomach
>> taped wrists together--[the Defendant] praying
>> taped ankles together.
>> pillow over head--"Don't look at me"
>> Tucker undid belt--[the Defendant] left room.
>> Tried to insert--too tight
>> rolled over--penetration

> The typed summary provides:

> As Kim and [the Defendant] lie on her bed, TUCKER bursts into the bedroom, puts handgun at Kim's head, calls her "Bitch" and tells her "If you look up, I'll kill you." TUCKER beg[i]ns to tape her up with electric tape as [the Defendant] begins to pray in the floor, explaining to TUCKER that he and Kim have no money etc.
>
> Kim does not actually see [the Defendant] again after this point but does hear him in her living room as TUCKER'S assault against her progressed.
>
> Although TUCKER put tape over Kim's eyes, the tape falls off early in the assault. Kim is able to articulate the manner in which TUCKER proceeds to victimize her from this point forward.

Finally, Officer Cunningham's statement provides, in pertinent part, that

> It was explained to Mr. Tucker that he was the suspect in a cutting and rape of a white female. Mr. Tucker stated that Mr. Cowart had brought him the car he was driving and had stated that the police was after him. Mr. Tucker stated that he and Mr. Cowart were headed to Chicago with Mr. Cowart. Mr. Tucker stated that he did not know anything about the victim.

The Defendant contends that all of these documents establish that, prior to trial, the victim identified Tucker as her assailant, and that, had his trial counsel been aware of these reports, the victim's credibility could have been more effectively impeached, thereby bolstering his own theory that his participation in the offenses was limited to assisting in a nonviolent theft of the victim's car.

*Id.*, slip op. at 7-8, 2003 WL 21487193 **6-7 (footnote omitted).

The Tennessee Court of Criminal Appeals carefully considered Cowart's claim of a *Brady* violation and agreed with the trial court that, while the prosecution failed to disclose information that was requested and was favorable to the defense, the exculpatory evidence was not material. The court first noted that, under Tennessee law, "[a]n especially

aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon and where the victim suffers serious bodily injury." *Id*., slip op. at 8, 2003 WL 21487193 *7 (citing TENN. CODE ANN. § 39-13-403(a)). The court further noted that there was "no question in this case that the victim was the subject of an especially aggravated robbery" and thus the only question was "the extent to which the Defendant participated in the remaining elements of the crime: violence involving the use of a deadly weapon resulting in serious bodily injury to the victim." *Id*., 2003 WL 21487193 *7.

The court then concluded there was not a reasonable probability that, had the notes in question been given to the defense prior to trial, the jury's verdict would have been different.

> The Defendant argues that the victim's credibility could have been more thoroughly impeached had defense counsel had access to the documents at issue. When the victim asserted at trial that she did not know who raped and cut her, defense counsel could have used the documents to establish that, prior to trial, she said that her assailant was Tucker. However, defense counsel *did* have access to the statement the victim made to Det. Hyde while she was in the emergency room, in which she identified Tucker (the man "she did not know") as the man who raped and cut her. Defense counsel also had access to the victim's eight page statement subsequently given to the police which indicates that the victim again identified Tucker as her assailant. Indeed, defense counsel used this statement to good effect during his cross-examination of the victim: the jury acquitted the Defendant of raping the victim. In essence, the documents now at issue were merely cumulative to this information. *Brady* does not require the disclosure of information already possessed by the defendant.
>
> Moreover, even if defense counsel, with the assistance of the documents at issue, had been able to further discredit the victim's trial testimony, the jury still had ample evidence upon which to convict the

13

Defendant of especially aggravated robbery. Officer Castro testified that the Defendant admitted to being involved in the violence committed against the victim. The Defendant denied making the statements testified to by Officer Castro. Obviously, the jury accredited Officer Castro's testimony and disbelieved the Defendant's version of events. This was the jury's prerogative, and we are confident that the jury's decision would have been the same even had defense counsel been given copies of the notes at issue.

*Id*. at 9, 2003 WL 21487193 **7-8 (citation omitted).

In reaching its conclusions, the Tennessee Court of Criminal Appeals relied on controlling federal law:

Evidence meets the definition of "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Stated another way,

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

Thus, the issue before this Court is whether the trial court erred in determining that the undisclosed evidence was not material.

*Id*. at 6-7, 2003 WL 21487193 **5-6 (quoting, respectively, *United States v. Bagley*, 473 U.S. 667, 682 (1985) and *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted)).

The state court's decision was in line with, and not contrary to, established federal law as set forth in *Brady* and *Bagley*. Under the circumstances, this court finds that the state court's conclusion that the undisclosed evidence was not material likewise was not an

14

unreasonable application of that established federal law. The court has reviewed the record, including the trial transcript, and agrees that the documents at issue were cumulative and that, had defense counsel received the documents prior to trial, the jury's decision would have been the same. Accordingly, Cowart is not entitled to relief on his *Brady* claim.

### *B. Juror Testimony*

Cowart also raised this claim on appeal to the Tennessee Court of Criminal Appeals in post-conviction proceedings. That court framed the issue as follows:

> The Defendant attempted to demonstrate that the jury would have decided the case differently by calling to the stand a juror who participated in the Defendant's trial. Counsel for the Defendant advised the court that this juror had reviewed the documents at issue and that, if allowed, he would testify that, if he had had the benefit of hearing the victim cross-examined on the basis of these documents, he would not have convicted the Defendant of anything more than simple robbery. The State strenuously objected to this proffered witness being allowed to testify. After significant discussion, the trial court ruled that the juror would not be allowed to testify on the grounds that such testimony is barred by Tennessee Rule of Evidence 606(b). The Defendant now contends that the trial court's ruling was in error, arguing that this rule of evidence should yield to the necessity of proving a *Brady* violation in order to sustain his claim for post-conviction relief.

*State v. Cowart*, slip op. at 9, 2003 WL 21487193 **8. The appellate court then rejected Cowart's claim:

> In pertinent part, Rule 606(b) provides:
>
> > Upon an inquiry into the validity of a verdict ..., a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or

15

> dissent from the verdict ... or concerning the juror's mental processes....

Tenn. R. Evid. 606(b). We agree with the trial court that this Rule prohibits the proffered testimony.

> Moreover, we are not persuaded that this Rule should be disregarded in the context of a post-conviction petitioner's attempt to prove that he or she suffered a constitutional violation. In this case, a finding that the suppressed information was "material" would have satisfied the Defendant's burden to prove that he had suffered a constitutional violation. As set forth above, the suppressed information would be deemed "material" only if we were convinced that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Neither this Court, nor the trial courts posited to make an initial finding, require the testimony of jurors in order to make this determination. Indeed, trial courts and this Court frequently make such determinations without the benefit of juror testimony in the context of claims of ineffective assistance of counsel. Accordingly, we reject the Defendant's contention that Tennessee Rule of Evidence 606(b) should not be applied in the context of attempts to prove that suppressed exculpatory information is "material."

*Id*., slip op. at 9-10, 2003 WL 21487193 **8 (quoting *United States v. Bagley*, 473 U.S. at 682; citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

This court concludes that the appellate court's determination that it was not constitutional error to disregard the juror's testimony was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court. As the U.S. Supreme Court observed in *Bagley*, it is up to the *reviewing court* to consider "any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." 473 U.S. at 683.

> The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the

defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.* Accordingly, it was not error for the trial court and the Tennessee Court of Criminal Appeals to disallow the testimony of the juror.

V.      Conclusion

Petitioner Cowart is not entitled to habeas corpus relief and for that reason the respondent's motion for summary judgment will be **GRANTED**. Cowart having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c). The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the FEDERAL RULES OF APPELLATE PROCEDURE.

     **AN APPROPRIATE ORDER WILL ENTER.**

                    s/ Leon Jordan
                 United States District Judge

17